J-S17002-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: D.S.B., A MINOR A/K/A D.B. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: K.D., MOTHER | |
| | No. 3705 EDA 2017 |

Appeal from the Decree Entered October 20, 2017
In the Court of Common Pleas of Philadelphia County
Family Court at No(s):
CP-51-AP-0000764-2017
CP-51-DP-0000367-2016

| | |
|---|---|
| IN THE INTEREST OF: D.A.B., A MINOR A/K/A D.B. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: K.D., MOTHER | |
| | No. 3707 EDA 2017 |

Appeal from the Decree Entered October 20, 2017
In the Court of Common Pleas of Philadelphia County
Family Court at No(s):
CP-51-AP-0000763-2017
CP-51-DP-0000368-2016

BEFORE: BENDER, P.J.E., LAZARUS, J., and KUNSELMAN, J.

MEMORANDUM BY BENDER, P.J.E.: **FILED MAY 03, 2018**

K.D. ("Mother") appeals from the decrees entered on October 20, 2017, in the Court of Common Pleas of Philadelphia County, which involuntarily terminated her parental rights to her minor children, D.A.B., born in April of 2014, and D.S.B., born in April of 2015, (collectively "Children"), and changed the goals for both Children to adoption. Additionally, Mother's counsel has

filed a petition to withdraw and a brief pursuant to ***Anders v. California***, 386 U.S. 738 (1967), and ***Commonwealth v. Santiago***, 978 A.2d 349 (Pa. 2009). Upon review, we grant counsel's petition to withdraw and affirm the termination decrees.

The trial court summarized the factual and procedural history of this matter as follows:

> The Philadelphia Department of Human Services ("DHS") first became aware of this family in February 2016 when it received a report regarding allegations that Mother was acting belligerent and inappropriately disciplining the Children. The report was determined to be valid, and based on the allegations in the report, an Order of Protective Custody was obtained for the Children. At the shelter care hearing for the Children on March 24, 2016, this [c]ourt granted temporary legal custody of the Children to DHS and granted Mother supervised visits with the Children at the agency. Following the shelter care hearing, DHS filed dependency petitions for the Children based on the information discussed *supra*. This [c]ourt subsequently held an adjudicatory hearing on April 19, 2016[,] and adjudicated the Children dependent based on Mother's present inability. At the adjudicatory hearing, this [c]ourt granted full legal custody of the Children to DHS and placed the Children with their maternal grandmother. An initial permanency review hearing was held on July 20, 2016, at which time, the permanency goal for the Children was identified as reunification.

> On July 31, 2017, DHS filed petitions to change the Children's permanency goal from reunification to adoption. A contested goal change hearing (hereinafter the "TPR" hearing) was held before this [c]ourt on October 20, 2017, at which time, DHS petitioned to involuntarily terminate the parental rights of Mother pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), (8) and (b). At the TPR hearing, the CUA [(Community Umbrella Agency)] social worker, Yasmin Carter, testified that the Children have been in foster care since their initial placement in February 2016. Ms. Carter testified that Mother's single case plan objectives were as follows: 1) to comply with the court and CUA's recommendations, 2) participate in and complete drug and alcohol treatment, 3)

participate in random drug screens, 4) participate in and complete a mental health program, and 5) attend weekly supervised visits with the Children. Mother's single case plan objectives have been consistent throughout the life of the case. According to Ms. Carter, the single case plans were generated every three months and Mother participated in those sessions. Mother, however, refused to sign a single case plan indicating that she knew what her objectives were. Mother also asked Ms. Carter to stop calling her and stated that she will not comply with anything CUA asked her to do.

In regards to Mother's compliance with her objectives, Ms. Carter testified that Mother was non-compliant. Specifically, Ms. Carter testified that Mother never completed a drug and alcohol program. Mother attended Sobriety Through Outpatient ("STOP") on a few occasions, but never completed a drug program at STOP. Mother participated in random drug screens at the Clinical Evaluation Unit ("CEU") and at STOP. On May 11, 2017 and July 14, 2017, Mother took random screens at the CEU and tested positive for Phencyclidine ("PCP"). Mother also tested positive for PCP and Benzodiazepines on August 4, 2017.[1] On September 11, 2017, Mother took a random screen at STOP and tested positive for Oxycontin. Ms. Carter testified that Mother was called for additional drug screens but did not attend those screenings.

[1]The record also indicated that Mother tested positive for PCP on June 19, 2016, July 11, 2016, and July 19, 2016.

With respect to Mother's mental health status, Mother was diagnosed with Bipolar Schizophrenia Disorder, but has never engaged in or completed a mental health program. Ms. Carter indicated that she had concerns about Mother's mental instability. Ms. Carter testified that the Children initially resided with their maternal grandmother, but were removed as a result of Mother's belligerent behavior. Specifically, in April 2016, Mother attempted to forcibly gain access to maternal grandmother's home, which resulted in Mother['s] being arrested and incarcerated for eight days. This [c]ourt subsequently issued a stay-away order as to maternal grandmother's home; however, Mother continued to go to maternal grandmother's home, despite the stay-away order. As a result, the Children were removed from maternal grandmother's home and placed in a general foster home. Ms. Carter subsequently testified that Mother threatened to physically

assault anyone who adopted the Children and that Mother's supervised visits were moved from the agency to DHS because Mother threatened to physically attack Ms. Carter.

When asked about Mother's visitation with the Children, Ms. Carter testified that Mother was to attend supervised weekly visits with the Children at [the] agency. Since August 2016, Mother has been offered 58 supervised visits with the Children and only attended 36 of those visits. Mother reported that many of the visits were missed because she had other obligations. Ms. Carter also testified that Mother forcibly grabs the Children during visits and gets upset when she is redirected by the visitation coach.

Ms. Carter indicated that it would be in the Children's best interest to terminate Mother's parental rights because she has not completed a drug and alcohol program, consistently tests positive for PCP, has never addressed her mental health needs, has not cared for the Children for approximately eighteen months and is not bonded with the Children. Ms. Carter further testified that the Children have a strong bond with their foster parent and look to their foster parent to meet their daily needs.

Ms. Nicole Langford, the visitation coach, also testified at the TPR hearing. According to Ms. Langford, Mother gets impatient and frustrated with the Children during visits and forcibly grabs the Children when they refuse to listen to her. Ms. Langford testified that the Children are not bonded with Mother and that D.S.B. does not allow Mother to hold her during visits and that she whines and pulls away when Mother tries to pick her up.

At the TPR hearing, Mother testified that she missed visits with her children when she had court dates or when she was busy. Mother denied using PCP and stated that she was unsure why her test screens indicated that she tested positive for PCP. Mother also denied ever testing positive for PCP; however, Mother admitted to testing positive for Benzodiazepines and Marijuana. Mother also admitted that she was not receiving mental health treatment.

Based on the foregoing testimony, this [c]ourt issued a decree involuntarily terminating the parental rights of Mother under 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5) and (8) and finding, in

accordance with 23 Pa.C.S.A. § 2511(b), that such termination best serves the developmental, physical, and emotional needs and welfare of the Children.[2] Mother, along with counsel, filed a timely Notice of Appeal along with a Statement of Errors.

> [2]In the decree entered on October 20, 2017, this [c]ourt also involuntarily terminated the parental rights of any unknown putative father.

Trial Court Opinion, 12/18/17, at 1-5 (citations to the record omitted).

Initially, we note that Mother's counsel filed an *Anders* brief and a petition to withdraw. Before reaching the merits of Mother's appeal, we must first address counsel's request to withdraw. *See Commonwealth v. Rojas*, 874 A.2d 638, 639 (Pa. Super. 2005) ("'When faced with a purported *Anders* brief, this Court may not review the merits of the underlying issues without first passing on the request to withdraw.'") (quoting *Commonwealth v. Smith*, 700 A.2d 1301, 1303 (Pa. Super. 1997)). "In *In re V.E.*, 417 Pa.Super. 68, 611 A.2d 1267 (1992), this Court extended the *Anders* principles to appeals involving the termination of parental rights." *In re X.J.*, 105 A.3d 1, 3 (Pa. Super. 2014). To withdraw pursuant to *Anders*, counsel must:

> 1) petition the court for leave to withdraw stating that, after making a conscientious examination of the record, counsel has determined that the appeal would be frivolous; 2) furnish a copy of the [*Anders*] brief to the [appellant]; and 3) advise the [appellant] that he or she has the right to retain private counsel or raise additional arguments that the [appellant] deems worthy of the court's attention.

*Commonwealth v. Cartrette*, 83 A.3d 1030, 1032 (Pa. Super. 2013) (*en banc*) (citing *Commonwealth v. Lilley*, 978 A.2d 995, 997 (Pa. Super.

- 5 -

2009)). With respect to the third requirement of **Anders**, that counsel inform the appellant of his or her rights in light of counsel's withdrawal, this Court has held that counsel must "attach to their petition to withdraw a copy of the letter sent to their client advising him or her of their rights." **Commonwealth v. Millisock**, 873 A.2d 748, 752 (Pa. Super. 2005).

Additionally, an **Anders** brief must comply with the following requirements:

(1) provide a summary of the procedural history and facts, with citations to the record;

(2) refer to anything in the record that counsel believes arguably supports the appeal;

(3) set forth counsel's conclusion that the appeal is frivolous; and

(4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

**Santiago**, 978 A.2d at 361.

In the instant matter, counsel has filed a petition to withdraw, certifying that he has reviewed the case and determined that Mother's appeal is wholly frivolous. Counsel also has filed a brief that includes a summary of the history and facts of the case, issues raised by Mother, and counsel's assessment of why those issues are frivolous, with citations to relevant legal authority. Counsel has included in his brief a copy of his letter to Mother, advising her that she may obtain new counsel or raise additional issues *pro se*. Accordingly, counsel has substantially complied with the requirements of

*Anders* and *Santiago*.  *See Commonwealth v. Reid*, 117 A.3d 777, 781

(Pa. Super. 2015) (observing that substantial compliance with the *Anders*

requirements is sufficient).  We, therefore, may proceed to review the issues

outlined in the *Anders* brief.  In addition, we must "conduct an independent

review of the record to discern if there are any additional, non-frivolous issues

overlooked by counsel." *Commonwealth v. Flowers*, 113 A.3d 1246, 1250

(Pa. Super. 2015) (footnote omitted).

Counsel's *Anders* brief lists the following in the section entitled

statement of questions presented:

> 1.    Whether the trial court committed reversible error, when it involuntarily terminated Mother's parental rights and changed the goal from reunification to adoption where such determination was not supported by clear and convincing evidence under the [A]doption [A]ct, 23 P[a].C.S.A. § 2511(a)(1), (2), (5), and (8)[?]
>
> 2.    Whether the trial court committed reversible error when it involuntarily terminated Mother's parental rights without giving primary consideration to the effect that the termination would have on the developmental, physical and emotion needs of the [Children] as required by the [A]doption [A]ct, 23 P[a].C.S.A. § 2511(b)[?]
>
> 3.    Whether[] the trial court erred because the evidence was overwhelming and undisputed that Mother demonstrated a genuine interest and sincere, persistent and unrelenting effort to maintain a parent-child relationship with her [Children?]

*Anders* brief at 5 (unnumbered).

In the argument section of the brief, counsel first presents a discussion

about the requirements for withdrawal of counsel.  He then presents

discussion relating to all three issues set forth above without dividing the

argument "into as many parts as there are question to be argued." Pa.R.A.P. 2119(a). Moreover, counsel does not provide headings describing "the particular point treated therein." *Id.* However, counsel does provide an appropriate discussion relating to each issue with citations to pertinent authorities. Therefore, because we are not hindered in our review of this matter, we will consider all arguments presented.

We begin with the claim that the goal for Children should not have been changed to adoption in that this change was not "best suited to the safety, protection and physical, mental and moral welfare" of Children. *Anders* brief at 12. Mother also contends that she has met some of her objectives and that she has a strong bond with Children.

In addressing this issue, we are guided by the following:

> In cases involving a court's order changing the placement goal … to adoption, our standard of review is abuse of discretion. *In re N.C.*, 909 A.2d 818, 822 (Pa. Super. 2006). To hold that the trial court abused its discretion, we must determine its judgment was "manifestly unreasonable," that the court disregarded the law, or that its action was "a result of partiality, prejudice, bias or ill will." *Id.* (quoting *In re G.P.-R.,* 851 A.2d 967, 973 (Pa. Super. 2004)). While this Court is bound by the facts determined in the trial court, we are not tied to the court's inferences, deductions and conclusions; we have a "responsibility to ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate legal principles to that record." *In re A.K.*, 906 A.2d 596, 599 (Pa. Super. 2006). Therefore, our scope of review is broad. *Id.*

*In re S.B.*, 943 A.2d 973, 977 (Pa. Super. 2008).

Furthermore, this Court has stated:

> Placement of and custody issues pertaining to dependent children are controlled by the Juvenile Act [42 Pa.C.S. §§ 6301-

- 8 -

65], which was amended in 1998 to conform to the federal Adoption and Safe Families Act ("ASFA"). The policy underlying these statutes is to prevent children from languishing indefinitely in foster care, with its inherent lack of permanency, normalcy, and long-term parental commitment. Consistent with this underlying policy, the 1998 amendments to the Juvenile Act, as required by the ASFA, place the focus of dependency proceedings, including change of goal proceedings, on the child. Safety, permanency, and well-being of the child must take precedence over *all* other considerations, including the rights of the parents.

**In re N.C.**, 909 A.2d 818, 823 (Pa. Super. 2006) (citations and footnotes omitted; emphasis in original).

Pursuant to section 6351(f) of the Juvenile Act, when considering a petition for goal change for a dependent child, the juvenile court is to consider, *inter alia*: (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; and (5) a likely date by which the goal for the child might be achieved. **In re S.B.**, 943 A.2d at 977. The best interests of the child, and not the interests of the parent, must guide the trial court. **Id.** at 978. As this Court has held, "a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." **In re N.C.**, 909 A.2d at 824 (quoting **In re Adoption of M.E.P.**, 825 A.2d 1266, 1276 (Pa. Super. 2003)).

Our review of the record and the trial court's opinion, which addresses Mother's issues relating to the termination of her parental rights, supports the

fact that she refused to accept many of the services that were offered to her. The services were directed at helping Mother to be drug free, to treat her mental health issues, and to obtain a home in which she and Children would be safe and healthy. By refusing to accept and participate in these services, Mother could not assure Children's safety if they were returned to her custody. Thus, we conclude that the trial court did not err in ordering the goal change from reunification to adoption as the change was in Children's best interests.

With regard to the arguments raised in relation to the termination of Mother's parental rights, we have reviewed the certified record, the briefs of the parties, the applicable law, and the thorough, 12-page opinion of the Honorable Daine Grey Jr. of the Court of Common Pleas of Philadelphia County, dated December 18, 2017. We conclude that Judge Grey's well-reasoned opinion accurately disposes of the issues relating to the parental rights termination issues presented on appeal and we discern no abuse of discretion or error of law. Accordingly, we adopt Judge Grey's opinion, namely, pages 5-12, as our own and employ that discussion as part of our basis for affirming the decrees from which these appeals arose.

In sum, our independent review of Mother's claims does not persuade us that she is entitled to relief. Moreover, our review of the record does not reveal any non-frivolous issues overlooked by counsel. **See Flowers**, 113 A.3d at 1250. Therefore, we grant counsel's petition to withdraw, and affirm the trial court's decrees.

Decrees affirmed.  Petition to withdraw granted.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/3/18

IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
JUVENILE DIVISION

| | | |
|---|---|---|
| IN RE: D.A.B and D.S.B. | : | SUPERIOR COURT |
| | : | 3707 EDA 2017 |
| | : | 3705 EDA 2017 |
| | : | |
| | : | |
| | : | COURT OF COMMON PLEAS |
| | : | CP-51-AP-0000763-2017 |
| | : | CP-51-DP-0000368-2016 |
| | : | CP-51-AP-0000764-2017 |
| | : | CP-51-DP-0000367-2016 |
| | : | FID: 51-FN-467547-2009 |
| | : | |
| APPEAL OF: K.D., Mother | : | |
| | : | |

**OPINION**

DAINE GREY JR., J.                    DATE: December 18, 2017

K.D. ("Mother") appeals this Court's decree, entered on October 20, 2017, involuntarily terminating her parental rights as to her two children, D.A.B. (born April 22, 2014) and D.S.B. (born April 19, 2015), (collectively, the "Children"). John Hayburn, counsel for Mother, filed a timely Children's Fast Track Appeal from the October 20, 2017 decree, with attached Concise Statement of Errors, Affidavit of Service, and other related documents necessary to perfect this appeal.

I.    PROCEDURAL HISTORY & FACTS

The relevant facts and procedural history of this case are as follows: The Philadelphia Department of Human Services ("DHS") first became aware of this family in February 2016

1

when it received a report regarding allegations that Mother was acting belligerent and inappropriately disciplining the Children. (N.T. 10/20/17 at 6). The report was determined to be valid, and based on the allegations in the report, an Order of Protective Custody was obtained for the Children. (*Id.* at 6). At the shelter care hearing for the Children on March 24, 2016, this Court granted temporary legal custody of the Children to DHS and granted Mother supervised visits with the Children at the agency. (Trial Court Order 3/24/16 at 1). Following the shelter care hearing, DHS filed dependency petitions for the Children based on the information discussed *supra*. (DHS Dependency Pet. for D.A.B. and D.S.B.). This Court subsequently held an adjudicatory hearing on April 19, 2016 and adjudicated the Children dependent based on Mother's present inability. (Trial Court Order 4/19/16 at 1). At the adjudicatory hearing, this Court granted full legal custody of the Children to DHS and placed the Children with their maternal grandmother. (*Id.*). An initial permanency review hearing was held on July 20, 2016, at which time, the permanency goal for the Children was identified as reunification. (Trial Court Order 7/20/16 at 1).

On July 31, 2017, DHS filed petitions to change the Children's permanency goal from reunification to adoption. (DHS Goal Change Pet. for D.A.B. and D.S.B.). A contested goal change hearing (hereinafter the "TPR" hearing) was held before this Court on October 20, 2017, at which time, DHS petitioned to involuntarily terminate the parental rights of Mother pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), (8) and (b). At the TPR hearing, the CUA social worker, Yasmin Carter, testified that the Children have been in foster care since their initial placement in February 2016. (N.T. 10/20/17 at 12). Ms. Carter testified that Mother's single case plan objectives were as follows: 1) to comply with the court and CUA's recommendations, 2) participate in and complete drug and alcohol treatment, 3) participate in random drug screens, 4)

2

participate in and complete a mental health program, and 5) attend weekly supervised visits with the Children. (*Id.* at 7). Mother's single case plan objectives have been consistent throughout the life of the case. (*Id.*). According to Ms. Carter, the single case plans were generated every three months and Mother participated in those sessions. (*Id.* at 19). Mother, however, refused to sign a single case plan indicating that she knew what her objectives were. (*Id.* at 20). Mother also asked Ms. Carter to stop calling her and stated that she will not comply with anything CUA asked her to do. (*Id.* at 20; 26).

In regards to Mother's compliance with her objectives, Ms. Carter testified that Mother was non-compliant. (*See Id.* at 7). Specifically, Ms. Carter testified that Mother never completed a drug and alcohol program. (*Id.*). Mother attended Sobriety Through Outpatient ("STOP") on a few occasions, but never completed a drug program at STOP. (*Id.* at 16-17). Mother participated in random drug screens at the Clinical Evaluation Unit ("CEU") and at STOP. (*Id.* at 16). On May 11, 2017 and July 14, 2017, Mother took random screens at the CEU and tested positive for Phencyclidine ("PCP"). (*Id.* at 8). Mother also tested positive for PCP and Benzodiazepines on August 4, 2017.[1] (*Id.*). On September 11, 2017, Mother took a random screen at STOP and tested positive for Oxycontin. (*Id.*). Ms. Carter testified that Mother was called for additional drug screens but did not attend those screenings. (*Id.*).

With respect to Mother's mental health status, Mother was diagnosed with Bipolar Schizophrenia Disorder, but has never engaged in or completed a mental health program. (*Id.*). Ms. Carter indicated that she had concerns about Mother's mental instability. Ms. Carter testified that the Children initially resided with their maternal grandmother, but were removed as

---

[1] The record also indicated that Mother tested positive for PCP on June 19, 2016, July 11, 2016, and July 19, 2016. (*Id.* at 44).

a result of Mother's belligerent behavior. (*Id.* at 12). Specifically, in April 2016, Mother attempted to forcibly gain access to maternal grandmother's home, which resulted in Mother being arrested and incarcerated for eight days. (*Id.*). This Court subsequently issued a stay-away order as to maternal grandmother's home; however, Mother continued to go to maternal grandmother's home, despite the stay-away order. (*Id.*). As a result, the Children were removed from maternal grandmother's home and placed in a general foster home. (*Id.*). Ms. Carter subsequently testified that Mother threatened to physically assault anyone who adopted the Children and that Mother's supervised visits were moved from the agency to DHS because Mother threatened to physically attack Ms. Carter. (*Id.*; 10).

When asked about Mother's visitation with the Children, Ms. Carter testified that Mother was to attend supervised weekly visits with the Children at agency. (*Id.* at 10). Since August 2016, Mother has been offered 58 supervised visits with the Children and only attended 36 of those visits. (*Id.* at 11). Mother reported that many of the visits were missed because she had other obligations. (*Id.* at 21). Ms. Carter also testified that Mother forcibly grabs the Children during visits and gets upset when she is redirected by the visitation coach. (*Id.* at 22).

Ms. Carter indicated that it would be in the Children's best interest to terminate Mother's parental rights because she has not completed a drug and alcohol program, consistently tests positive for PCP, has never addressed her mental health needs, has not cared for the Children for approximately eighteen months, and is not bonded with the Children. (*Id.* at 13; 25-26). Ms. Carter further testified that the Children have a strong bond with their foster parent and look to their foster parent to meet their daily needs. (*Id.* at 24-25).

Ms. Nicole Langford, the visitation coach, also testified at the TPR hearing. According to Ms. Langford, Mother gets impatient and frustrated with the Children during visits and

4

forcibly grabs the Children when they refuse to listen to her. (*Id.* at 28). Ms. Langford testified that the Children are not bonded with Mother and that D.S.B. does not allow Mother to hold her during visits and that she whines and pulls away when Mother tries to pick her up. (*Id.* at 29).

At the TPR hearing, Mother testified that she missed visits with her children when she had court dates or when she was busy. (*Id.* at 37). Mother denied using PCP and stated that she was unsure why her test screens indicated that she tested positive for PCP. (*Id.* at 35). Mother also denied ever testing positive for PCP; however, Mother admitted to testing positive for Benzodiazepines and Marijuana. (*Id.* at 42-43). Mother also admitted that she was not receiving mental health treatment. (*Id.* at 36).

Based on the foregoing testimony, this Court issued a decree involuntarily terminating the parental rights of Mother under 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5) and (8) and finding, in accordance with 23 Pa.C.S.A. § 2511(b), that such termination best serves the developmental, physical, and emotional needs and welfare of the Children.[2] (Trial Court Order 10/20/17 at 1). Mother, along with counsel, filed a timely Notice of Appeal along with a Statement of Errors.

## II.    DISCUSSION

### A.    This Court Properly Granted Petitioner's Petition to Involuntarily Terminate the Parental Rights of Mother Pursuant to Sections 2511(a)(1), (2), (5), (8) and (b)

Under Pennsylvania law, the party seeking termination must establish, by clear and convincing evidence, the existence of grounds for termination. *In re J.L.C.*, 837, A.2d 1247, 1251 (Pa. Super. 2003). It is well established that courts must examine the circumstances of

---

[2] In the decree entered on October 20, 2017, this Court also involuntarily terminated the parental rights of any unknown putative father.

5

each case and consider all explanations provided by the parent facing involuntary termination of his or her parental rights "to determine if the evidence, in light of the totality of the circumstances clearly warrants the involuntary termination." *Id.* Furthermore, an appellate court must apply an abuse of discretion standard when considering a trial court's determination of a petition to terminate parental rights. *In re R.J.T.*, 608 Pa. 9 A3d. 1179, 1190 (2010). This standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *Id.* It is well established that an abuse of discretion will not result merely because the reviewing court might have reached a different decision. *Id.* Additionally, in order to affirm, an appellate court need only agree with the trial court as to any one subsection of 2511(a), as well as 2511(b). *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004).

Instantly, this Court found that grounds for involuntary termination of Mother's parental rights existed pursuant to 2511(a)(1), (2), (5), (8) and (b). (*See* Trial Court Order 10/20/17 at 1). This Court will address each subsection separately.

1. **This Court Properly Terminated Mother's Parental Rights Pursuant to Section 2511(a)(1)**

With respect to Section 2511(a)(1), Pennsylvania law provides that the rights of a parent may be involuntarily terminated after a petition has been filed if "[t]he parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties." 23 Pa.C.S.A. § 2511(a)(1).

Under these specific facts and circumstances, this Court found clear and convincing evidence that Mother demonstrated a settled purpose of relinquishing parental claim to the

6

Children and failed to perform any parental duties. The Children were removed from Mother's care in February 2016. (N.T. 10/20/17 at 6). Mother's refusal to parent since that time was demonstrated by her failure to comply with her single case plan objectives. Mother failed to address her mental health needs and has never completed a drug and alcohol program. (*Id.* at 9-10). Mother continues to test positive for PCP and Marijuana. (*Id.* at 8; 44). Most importantly, Mother has concerning anger issues. According to the testimony of the CUA social worker, Mother's visits with the Children were moved from the agency to DHS as a result of threats Mother made to the worker. (*Id.* at 10). Mother also showed up to maternal grandmother's home despite the existence of a stay-away order. (*Id.* at 12). Furthermore, Mother did not consistently participate in visitation with her children. (*Id.* at 11). These minimal objectives would have demonstrated Mother's interest in caring for her children; however, Mother made little efforts to fulfill these objectives. Accordingly, this Court found termination of Mother's parental rights warranted pursuant to 2511(a)(1).

## 2. This Court Properly Terminated Mother's Parental Rights Pursuant to Section 2511(a)(2)

When terminating parental rights pursuant to Section 2511(a)(2), the moving party must prove by clear and convincing evidence

> [t]he repeated and continued incapacity, neglect, abuse or refusal of the parent has caused the child to be without parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2); *See also, In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003). Additionally, the grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct, but

may also include acts of refusal as well as incapacity to perform parental duties. *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002). In *In re Adoption of M.E.P.*, Westmoreland County Children's Bureau took custody of the child, citing the mother's inability to care for her child due to the mother's mental handicap. 825 A.2d at 1268. Following adjudication of the child, the mother was ordered to apply for welfare programs, obtain housing, and receive counseling in order to promote her independence and parenting skills. *Id.* at 1269. It was reported that the mother did not attempt to obtain welfare or housing and refused counseling. *Id.* As a result, the trial court terminated the mother's parental rights approximately two years after the child was removed from the home. *Id.* at 1270. The Superior Court found that the mother's inability to develop parenting skills, along with her refusal to fulfill her objectives, would leave the child without proper parental care; thus, termination of the mother's parental rights was warranted under Section 2511(a)(2). *Id.* at 1273.

Applying *M.E.P.* and the elements set forth under 2511(a)(2) to the instant case, it is clear that DHS met their burden of demonstrating that termination was proper. The evidence established that "incapacity" and "refusal" under 2511(a)(2) existed given that Mother failed to demonstrate a concrete desire or ability to remedy the problems that led to the Children's placement. Mother failed to cooperate with the services provided by CUA, including drug and alcohol treatment and mental health counseling. (N.T. 10/20/17 at 9-10). Mother also refused to sign her single case plan objectives and informed the worker that she would not comply with her objectives. (*Id.* at 20). Moreover, the evidence established that "neglect" existed given that Mother did not consistently visit the Children. (*Id.* at 11). This Court found that Mother's failure to fully comply with her objectives throughout the life of the case has left the Children without essential parental care, and the cause of such neglect, refusal and continued incapacity will not

8

be remedied by Mother. Based on the foregoing, this Court found that competent evidence existed to justify the termination of Mother's parental rights pursuant to Section 2511(a)(2).

### 3. This Court Properly Terminated Mother's Parental Rights Pursuant to Sections 2511(a)(5) and (8)

As the requirements for terminating parental rights under Sections 2511(a)(5) and (8) are similar, this Court will address them simultaneously. To terminate pursuant to 2511(a)(5), the petitioner must prove that

> (1) the child has been removed from parental care for at least six months; (2) the conditions which led to removal or placement of the child continue to exist; (3) the parents cannot or will not remedy the conditions which led to removal or placement within a reasonable period of time; (4) the services reasonably available to the parent are unlikely to remedy the conditions which led to removal or placement within a reasonable period of time; and (5) termination of parental rights would best serve the needs and welfare of the child.

*In re B.C.*, 36 A.3d 601, 607 (Pa. Super. 2012)[3]. In order to terminate under 2511(a)(8), the petitioner must prove that "(1) the child has been removed from the care of the parent for at least twelve months; (2) the conditions that led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child." *In re C.L.G.*, 956 A.2d 999, 1005 (Pa. Super. 2008)[4]. Furthermore, unlike 2511(a)(5),

---

[3] In *In re B.C.*, 36 A.3d 601 (Pa. Super. 2012), for example, Children and Youth Services obtained custody of the child after reports were received indicating that the mother and father could not care for the child. *Id.* at 608. In affirming the termination of the father's parental rights, the Superior Court emphasized the father's failure to comply with his objectives from Children and Youth Services, including obtaining housing and addressing his history as a sex offender through treatment. *Id.* The court stressed that the father's refusal to enter into treatment for the crimes he perpetrated lead to the unsafe condition still being present. *Id.* Furthermore, the court determined that the father's refusal to participate in his objectives demonstrated that the services provided to him would not remedy the dependency. *Id.* at 610. Lastly, the court found that terminating the father's parental rights would best serve the needs and welfare of the child as it would provide the child with stability. *Id.* at 610.

[4] In *In re C.L.G.*, 956 A.2d 999 (Pa. Super. 2008), for example, the child was removed from the mother's care after the child tested positive for cocaine at birth. *Id.* Also, the mother did not have adequate housing

termination under 2511(a)(8) does not require an evaluation of a parent's willingness or ability to remedy the conditions that led to placement. *See In re Adoption of R.J.S.*, 901 A.2d 502, 511 (Pa. Super. 2006) (citations omitted).

In the instant case, this Court determined that DHS satisfied the requirements of Sections 2511(a)(5) and (8). The Children have been in care for approximately eighteen months. (N.T. 10/20/17 at 52). They were initially removed from Mother's home amid concerns regarding her mental health instability and drug and alcohol history. (*Id.* at 6). Since that time, Mother has not progressed in any of the treatment offered to her. (*Id.* at 9-10). Specifically, Mother still has drug and mental health issues. (*Id.*). As a result, this Court believes that Mother will not remedy the conditions which led to the placement of her children. Also, Mother's refusal to participate in her objectives demonstrates that the services provided to her would not alleviate the circumstances which necessitated the original placement of the Children. Moreover, the evidence clearly established that termination would be in the best interest and welfare of the Children as they are well-adjusted in their pre-adoptive home and have a strong bond with their foster parent. *(See Id.* at 24-25). Thus, this Court properly terminated Mother's parental rights pursuant to Sections 2511(a)(5) and (8).

---

and could not properly care for the child. *Id.* The largest obstacle to reunification was the mother's continued drug use and inability to obtain stable housing. *Id.* at 1005. The trial court terminated the mother's parental rights pursuant to 2511(a)(8) approximately one year after the child was removed from her care. *Id.* at 1003. The Superior Court affirmed the trial court's ruling, stressing that waiting further for the mother to comply would toll the child's wellbeing. *Id.* at 1007. In the interest of creating stability for the child, the court found that termination of the mother's parental rights would best serve the needs and welfare of the child. *Id.* at 1008-1009.

**B. This Court Properly Ruled that it Would be in the Children's Best Interest to Terminate the Parental Rights of Mother Pursuant to Section 2511(b)**

Having found that the statutory grounds for termination have been satisfied pursuant to 2511(a), this Court further found that termination of Mother's parental rights serves the best interest of the Children pursuant to 2511(b).[5]

Under Section 2511(b), the party seeking termination must prove by clear and convincing evidence that termination is in the best interest of the child. *In re Bowman*, 436 Pa. Super. 647 A.2d 217, 218 (1994). In determining the best interest of the child, courts must consider both the needs and welfare of the child. *In re K.Z.S.*, 946 A.2d 753, 760 (Pa. Super. 2008). Intangibles such as love, comfort, security and stability are also considered when making a determination. *Id. (citing In re C.P.*, 901 A.2d 516, 520 (Pa. Super. 2006)). Furthermore, the parent-child relationship is examined in order to determine what effect the potential termination would have on the child. *See K.Z.S.*, 946 A.2d at 760. Typically, when examining the nature of the parent-child relationship, courts must consider whether there is a natural bond between the parent and child, and if termination of parental rights would sever "an existing, necessary, and beneficial relationship." *Id.* In cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *Id.* at 762-63.

In the instant matter, this Court determined that the Children would not suffer irreparable emotional harm if Mother's parental rights were terminated. There was compelling testimony offered at the TPR hearing that the Children are not bonded with Mother. (*See Id.* at 25-26; 29). Mother failed to offer any evidence establishing the existence of a parent-child bond. The

---

[5] *See In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) ("Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b)").

11

testimony demonstrated that the Children's primary bond is with their foster parent. (*See Id.* at 25-26). Furthermore, this Court found Mother's sporadic visits with the Children insufficient to foster a meaningful and healthy parental connection. This Court believes that we are nowhere closer to reunification now than we were when this case first came in in February 2016. Additionally, in determining that termination would best serve the needs and welfare of the Children, this Court considered that Mother has not been able to meet the Children's emotional, physical, and developmental needs, or provide the Children with a healthy, safe environment for eighteen months prior to the TPR hearing. (*Id.* at 25-26). For the foregoing reasons, this Court properly granted DHS's petition to involuntarily terminate the parental rights of Mother pursuant to Section 2511(b).

## III. CONCLUSION

Accordingly, this Court respectfully requests that the instant appeal be denied.

BY THE COURT:

_____

J.

12